**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOHN C. BREITENBACH, JR.,**
**Individually and as Executor of the**
**Estate of DEBORAH J. BREITENBACH,**

       **Plaintiff,**

v.                                                              **1:16-CV-00011 (NAM/CFH)**

**UNITED STATES OF AMERICA;**
**NANCY A. CAFFREY, R.P.A.-C;**
**MOSES-LUDINGTON HOSPITAL;**
**and INTER-LAKES HEALTH, INC.,**

       **Defendants.**
_____

**APPEARANCES:**

Joseph R. Brennan
Brennan, White Law Firm
163 Haviland Road
Queensbury, NY 12804
_Attorney for Plaintiff_

Grant C. Jaquith
United States Attorney
Karen Folster Lesperance
Assistant United States Attorney
Office of the United States Attorney
445 Broadway, Room 218
Albany, NY 12207
_Attorneys for Defendant United States of America_

Konstandinos D. Leris
Shawn F. Brousseau
Napierski, Vandenburgh Law Firm
296 Washington Avenue Extension
Albany, NY 12203
_Attorneys for Defendants Caffrey, Moses-Ludington Hospital, and Inter-Lakes Health, Inc._

**Hon. Norman A. Mordue, Senior U.S. District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.   INTRODUCTION

Plaintiff John C. Breitenbach, Jr., individually and as the Executor of the estate of his deceased wife, Deborah J. Breitenbach, brings this medical malpractice action against Defendants the United States of America, Nancy A. Caffrey, R.P.A.-C, Moses-Ludington Hospital, and Inter-Lakes Health, Inc.  (Dkt. No. 18).  Presently before the Court are Defendants' motions for summary judgment.  (Dkt. No. 44; Dkt. No. 46).  For the reasons that follow, Defendants' motions are granted in part and denied in part.

## II.   PROCEDURAL HISTORY

Plaintiff originally initiated this suit against the Hudson Headwaters Health Network ("HHHN") and Toni M. Sturm, M.D.  (Dkt. No. 1).  Plaintiff alleged that HHHN received federal funding, and that Dr. Sturm was employed by HHHN.  (*Id.*, ¶¶ 5–7).  Plaintiff ultimately added the United States, Caffrey, Moses-Ludington Hospital, and Inter-Lakes Health, Inc. as defendants in the Second Amended Complaint.  (Dkt. No. 18).  Plaintiff also agreed to dismiss HHHN and Dr. Sturm as defendants, because the United States was the real party in interest. (Dkt. No. 19).  The Court thus has jurisdiction pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1).

## III.   BACKGROUND

### A.  Relevant Medical Terminology

The following is a brief summary of some of the medical terms that are relevant to Plaintiff's allegations; these definitions do not constitute findings of fact as to any issues in this

case. The epiglottis is a "lid" of cartilage that covers the windpipe, or trachea.[1] Epiglottitis is a disease that causes the epiglottis to swell, which can lead to respiratory failure.[2] One of the symptoms of epiglottitis is a stridor, or wheezing sound when breathing.[3]

If epiglottitis results in respiratory failure, there are several procedures that circumvent the epiglottis and allow the afflicted patient to receive oxygen. These include rapid sequence intubation ("RSI"), in which a neuromuscular blocking agent is used to paralyze the patient's involuntary muscular responses, which facilitates the passage of a breathing tube into the patient's trachea.[4] RSI is an endotracheal intubation technique, or a technique to manage a patient's airway by placing a tube into the trachea through the nose or mouth.[5] A video laryngoscope device may be used to help visualize the patient's the airway.[6] An alternative method of airway management is a cricothyrotomy, of which there are two types relevant for this case.[7] A needle cricothyrotomy entails using a needle to pierce the trachea with a catheter attached to allow airflow.[8] For a surgical cricothyrotomy, the medical professional makes an incision in the neck and passes a breathing tube into the trachea.[9] Lastly, a bougie is a device which may be used to help facilitate intubation; the flexible device is inserted into the airway

---

[1] Mayo Clinic, *Epiglottitis*, https://www.mayoclinic.org/diseases-conditions/epiglottitis/symptoms-causes/syc-20372227 (last visited August 28, 2018).

[2] *Id.*

[3] *Id.*

[4] UptoDate, *Rapid sequence intubation for adults outside the operating room*, https://www.uptodate.com/contents/rapid-sequence-intubation-for-adults-outside-the-operating-room#H18 (last visited August 28, 2018).

[5] Merriam-Webster Medline Plus Medical Dictionary, *Endotracheal intubation*, https://medlineplus.gov/ency/article/003449.htm (last visited August 28, 2018).

[6] *See* UptoDate, *Video laryngoscopes and optical stylets for airway management for anesthesia in adults*, https://www.uptodate.com/contents/video-laryngoscopes-and-optical-stylets-for-airway-management-for-anesthesia-in-adults#H3065597602 (last visited August 28, 2018).

[7] UptoDate, *Needle cricothyroidotomy with percutaneous transacheal ventilation*, https://www.uptodate.com/contents/needle-cricothyroidotomy-with-percutaneous-transtracheal-ventilation#H1 (last visited August 28, 2018).

[8] *Id.*

[9] *Id.*

first and then an endotracheal tube is railroaded over the bougie into the airway, and the bougie is then removed.[10]

## B. Relevant Facts[11]

### 1) Initial Presentation

At 8:55 a.m. on April 21, 2014, Decedent, age 60, presented to the Moses-Ludington Hospital Emergency Department ("MLED") in Ticonderoga, New York, with her chief complaint being the sensation of having aspirin stuck in her throat. (Dkt. No. 44-2, p. 64). Defendant Caffrey, a Registered Physician's Assistant-Certified, examined Decedent at 9:05 a.m. and noted the patient's throat looked normal and there were no visible signs of pill fragments. (Dkt. No. 44-6, pp. 21–22; Dkt. No. 47-1, p. 3). Decedent was drinking water without difficulty, and had no respiratory issues, hoarseness, or difficulty swallowing. (Dkt. No. 47-1, p. 3). Caffrey told Decedent the pill would likely have dissolved, but that it irritated the throat in the process, creating a sensation that Decedent still had something in her throat. (*Id.*). Caffrey then discharged Decedent and told her to follow up with her primary care physician and discuss an ENT evaluation if the problems persisted the next day. (*Id.*, p. 4). Caffrey directed her to return to MLED if she experienced difficulties swallowing, breathing, or keeping fluids down. (*Id.*).

---

[10] *See* Anesthesia Airway Management, University of California San Francisco, *(Gum-elastic) bougie*, https://aam.ucsf.edu/article/gum-elastic-bougie (last visited August 28, 2018).
[11] The facts are drawn from the undisputed facts in Defendants' Statements of Material Facts (Dkt. No. 44-13; Dkt. No. 46-2); Plaintiff's Response (Dkt. No. 49-1); and the exhibits submitted in connection with Defendants' motions, including the depositions of Plaintiff (Dkt. No. 44-4), Caffrey (Dkt. No. 44-6), Dr. Sturm (Dkt. No. 44-5), and Dr. Bachman (Dkt. No. 44-8), as well as affidavits from Dr. Bachman (Dkt. No. 49-14), Dr. Pauzé (Dkt. No. 46-3), and Dr. Heffner (Dkt. No. 44-11). Where the facts stated by the moving parties are supported by testimonial or documentary evidence, and denied with only a conclusory statement, the Court has found such facts to be true. *See* Local Rule 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.").

Decedent's symptoms grew worse over the course of the day, and at around 7:30 p.m., she went to Ticonderoga Health Center for a follow-up appointment. (Dkt. No. 44-2, p. 37; Dkt. No. 44-4, p. 35). On physical exam, she had an audible stridor, discomfort opening her mouth, and swelling on the left side of her face and neck. (Dkt. No. 47-3, p. 2). Decedent was quickly referred back to MLED for further evaluation. (*Id.*, p. 3).

### 2) Diagnosis and Treatment

Caffrey was still on duty at MLED, and she reassessed Decedent at 7:41 p.m. (Dkt. No. 44-2, p. 10). Caffrey "was concerned about the possibility of epiglottitis," and ordered a "stat" soft tissue neck X-ray at 7:57 p.m. (*Id.*, pp. 12, 36, 44). Caffrey also ordered additional blood tests, which were completed at 8:11 p.m. (*Id.*, pp. 34–37). The X-ray was performed at approximately 8:12 p.m. and the results confirmed the diagnosis of epiglottitis. (*Id.*, p. 40). Caffrey ordered steroids, anti-inflammatories, the antibiotic Sentaxin, and fluids via IV. (Dkt. No. 44-2, p. 12; Dkt. No. 44-8, pp. 28–29). At 8:15 p.m., Caffrey called Dr. Hubbell, an ENT specialist at Fletcher Allen Health Care in Burlington, Vermont, who agreed to accept Decedent for immediate transfer. (Dkt. No. 44-2, p. 12). Caffrey then had the hospital switchboard call Essex County Dispatch to request a helicopter transfer, but was told it would be at least fifty-five minutes. (Dkt. No. 44-6, p. 30; *see* Dkt. No. 44-2, pp. 15–16). Instead of waiting, Caffrey requested an ambulance to transfer Decedent to Fletcher Allen. (Dkt. No. 44-2, pp. 15–16; Dkt. No. 44-6, p. 31). The ambulance crew was dispatched at 8:36 p.m. and arrived at MLED at 8:46 p.m. (Dkt. No. 47-5, pp. 3–4; Dkt. No. 47-6, p. 6).

As Decedent awaited transfer, her condition deteriorated, with increasing respiratory distress and stridor, and she was deemed unsafe for transport without an established airway. (Dkt. No. 44-2, pp. 12–13; Dkt. No. 44-6, pp. 43–44). Caffrey testified that at that point she

called Dr. Sturm and advised her that she needed help with a patient "with epiglottitis whose airway was very compromised." (Dkt. No. 44-5, pp. 36–37; Dkt. No. 44-6, p. 32; Dkt. No. 44-2, p. 13). As a Critical Access Hospital, Moses-Ludington is subject to different staffing requirements from other hospitals; Moses-Ludington did not need to have surgeons or specialists on-site, and only needed to have a supervising physician on-call and capable of being on-site within sixty minutes. (Dkt. No. 44-11, ¶ 8). Dr. Sturm was the on-call supervising physician for MLED on the night of April 21, 2014. (Dkt. No. 44-5, p. 10; Dkt. No. 44-6, p. 10). Dr. Sturm testified that when she and Caffrey treated Decedent, it was Dr. Sturm who ultimately "made the final decisions on what we would do and what course we would follow." (Dkt. No. 44-5, p. 19).

### 3) Airway Preparation

Dr. Sturm was already on-site and saw Decedent at 8:45 p.m. (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 3). Upon exam, Decedent was still able to breathe on her own but with difficulty and audible stridor. (Dkt. No. 44-5, pp. 38–39; Dkt. No. 47-6, p. 4). Dr. Sturm agreed that Decedent was in respiratory distress and not fit for transportation without an established airway. (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 4). Caffrey and Dr. Sturm called Dr. Hubbell again, who agreed Decedent needed to have her airway secured before being transported. (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 4). From their description of the situation, Dr. Hubbell felt that intubation, rather than a cricothyrotomy, would provide a more secure airway for Decedent. (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 4). Neither Caffrey nor Dr. Sturm had ever before attempted either a needle or surgical cricothyrotomy on a live patient, but both had experience with intubation and RSI. (Dkt. No. 44-5, pp. 21, 24–25; Dkt. No. 44-6, pp. 17, 49). After consulting with Dr. Hubbell, Caffrey and Dr. Sturm decided to first attempt an

awake intubation, then RSI if that failed, and if both of those options failed, they would attempt a cricothyrotomy. (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 5). In preparation, Caffrey marked the relevant landmarks on Decedent's throat for the potential cricothyrotomy. (Dkt. No. 44-2, p. 13; Dkt. No. 44-5, p. 66; Dkt. No. 44-6, pp. 48–49; Dkt. No. 47-6, p. 5).

### 4) Awake Intubation

At 9:08 p.m., Decedent was given lidocaine via nebulizer to numb her airway for the awake intubation, with the drug taking effect after approximately eight to ten minutes.[12] (Dkt. No. 44-2, pp. 13–14, 23; Dkt. No. 44-5, pp. 60–61; Dkt. No. 47-6, p. 5). Caffrey and Dr. Sturm then tried to view Decedent's airway by direct line of sight and video laryngoscopy, but her anatomy was obscured by "massive redundant red inflamed tissue" and her epiglottis was not readily discernible. (Dkt. No. 44-2, p. 13; Dkt. No. 44-5, pp. 62–63; Dkt. No. 44-6, pp. 51–52). Dr. Sturm testified that "she had swelling blocking direct vision of the vocal cords." (Dkt. No. 44-5, p. 80). At 9:20 p.m., Caffrey attempted the awake intubation, but she was unable to access the trachea. (Dkt. No. 44-5, pp. 61–63).

### 5) Rapid Sequence Intubation

As a result, Caffrey and Dr. Sturm proceeded to the RSI. (Dkt. No. 44-5, pp. 63–64; Dkt. No. 44-6, pp. 51–52). Caffrey was chosen to perform the procedure because she had more experience in airway management than Dr. Sturm. (Dkt. No. 44-5, pp. 26–27; Dkt. No. 44-6, pp. 48–49; Dkt. No. 47-6, p. 5). At 9:22 p.m. and 9:23 p.m., Decedent was given two drugs for the RSI: a sedative rendering her unconscious and a paralytic agent to ensure no body

---

[12] Times for the relevant procedures here are taken from Decedent's certified medical records, in particular the Nurses Notes. (*See* Dkt. No. 44-2, p. 23). Plaintiff contends that these notes contain "superimposed changes" that raise issues of fact. (Dkt. No. 49-1, ¶ 53; Dkt. No. 49-14, ¶ 17). However, none of the times appear to have been altered, and moreover, they match up with the chart created by Plaintiff's expert Dr. Bachman. (*See* Dkt. No. 44-7, pp. 8–9). Therefore, the timeline during which the relevant procedures took place is not in dispute.

movements or coughing.  (Dkt. No. 44-2, p. 23; Dkt. No. 44-5, pp. 67–68; Dkt. No. 44-6, p. 60).

Once these drugs were given, Decedent could no longer breathe on her own and received

oxygen via a mask over her face, with Dr. Sturm squeezing an AMBU bag.[13]  (Dkt. No. 44-5,

pp. 73–75).  At 9:28 p.m., Caffrey attempted the RSI.  (Dkt. No. 44-5, p. 68; Dkt. No. 44-6, p.

77).  During the RSI, the tube entered Decedent's esophagus, rather than her trachea, and the

attempt failed.  (Dkt. No. 44-2, pp. 13–14; Dkt. No. 44-5, p. 58; Dkt. No. 47-6, p. 5).

### 6)  Needle Cricothyrotomy

Next, Caffrey attempted a needle cricothyrotomy at 9:34 p.m.  (Dkt. No. 44-2, pp. 14,

23; Dkt. No. 44-5, p. 73; Dkt. No. 44-6, p. 63; Dkt. No. 47-6, p. 5).  The needle cricothyrotomy

also failed.  (Dkt. No. 44-2, p. 14; Dkt. No. 44-5, p. 74; Dkt. No. 47-6, p. 5).  Caffrey testified

that only a minute or two elapsed during this procedure because "[i]t was clear it wasn't

working."  (Dkt. No. 44-6, pp. 68–69).  Dr. Sturm testified that during this procedure, she was

"attempting to provide [Decedent] with oxygen with . . . bagging and a mask."  (Dkt. No. 44-5,

p. 78).  Around this time, she noticed that Decedent's oxygen levels were dropping.  (*Id.*, p. 75).

### 7)  Surgical Cricothyrotomy

At 9:46 p.m., Caffrey attempted the surgical cricothyrotomy.  (Dkt. No. 44-2, pp. 14–15;

Dkt. No. 47-6, p. 5).  Caffrey testified that she first made a vertical incision through the skin of

Decedent's throat, and then she believes that she made a horizontal incision through the

underlying cartilage, approximately 1.0–1.5 centimeters in size.  (Dkt. No. 44-6, pp. 67, 70–71).

Dr. Sturm testified that she was working on "the airway part, so [she] wasn't watching exactly

as [Caffrey] cut."  (Dkt. No. 44-5, p. 78).  Caffrey testified that just after making the incision,

Decedent moved her head.  (Dkt. No. 44-6, p. 72).  Caffrey first attempted to pass a 5.0

---

[13] AMBU refers to Artificial Manual Breathing Unit.  *See* Anesthesia General, *AMBU Ventilation*,
https://anesthesiageneral.com/ambu-ventilation/ (last visited August 28, 2018).

millimeter tube down Decedent's trachea, but was unable to do so.  (Dkt. No. 44-6, p. 71).

Caffrey testified that the tube was too big for the incision she made.  (*Id.*).  Next, she attempted

to pass a 3.0 millimeter tube, but the tube kinked in the process and could not ventilate

Decedent.  (*Id.*, pp. 71, 73).  Finally, Dr. Sturm was able to pass a 3.5 millimeter tube and

establish an airway.  (Dkt. No. 44-5, pp. 86–87; Dkt. No. 44-6, p. 76; Dkt. No. 47-6, p. 6).

Dr. Sturm testified that she was able to use her finger to guide the tube in, and that the

opening was higher than where Caffrey had made the incision because of additional swelling

and also movement by Decedent.  (Dkt. No. 44-5, pp. 82–83).  Dr. Sturm also testified that a 3.0

millimeter tube was smaller than what would be used for a standard adult.  (*Id.*, p. 84).  In total,

the surgical cricothyrotomy took approximately twelve minutes to perform, and was completed

at 9:58 p.m.  (Dkt. No. 44-2, p. 23).

### 8)  Cardiac Arrest and Death

During the surgical cricothyrotomy, Decedent went into cardiac arrest at 9:47 p.m.

(Dkt. No. 44-2, pp. 14–15; Dkt. No. 47-5, p. 91; Dkt. No. 47-6, p. 6).  Caffrey testified that, as

she was attempting to pass the 3.0 millimeter tube, "staff alerted me that they were unable to

feel a good pulse and I had them start compressions."  (Dkt. No. 44-6, pp. 71–72).  Caffrey

continued the cricothyrotomy during this time.  (*Id.*, p. 76).  After approximately ten minutes of

CPR and three doses of epinephrine, Decedent was successfully resuscitated.  (Dkt. No. 44-2,

pp. 14–15; Dkt. No. 47-6, p. 6).  By 9:58 p.m., around the time Decedent had a ventilation tube

in place, they were able to get a pulse.  (Dkt. No. 44-6, pp. 64, 77).  After the procedure,

Caffrey and Dr. Sturm assessed Decedent's neurologic function and found that she did not have

any pupillary response and there was no movement in her limbs.  (Dkt. No. 44-5, p. 92).  In the

next hour, from 9:58 p.m. until 10:50 p.m., they attempted to cool Decedent's body

temperature, "which is the standard procedure after someone's pulse returns in cardiac arrest but they don't have evidence of neurologic function." (*Id.*).

At 11:00 p.m., the ambulance left with Decedent, and Dr. Sturm rode along to maintain pressure on the site of the cricothyrotomy, which had been bleeding. (Dkt. No. 44-5, p. 90; Dkt. No. 47-5, pp. 3–4; Dkt. No. 47-6, pp. 6–7). At 11:55 p.m., the ambulance arrived at Fletcher Allen. (Dkt. No. 47-5, pp. 3–5). Decedent's oxygen levels stayed within a range of 90–100% throughout transport. (*Id.*, p. 3). Upon arrival, an ENT resident was unable to intubate Decedent using a bougie. (Dkt. No. 44-3, p. 12). Eventually, an anesthesiologist was called who successfully used a bougie to perform an orotracheal intubation. (*Id.*). However, doctors determined that Decedent had suffered an anoxic brain injury, and on April 22, 2014, she passed away upon the withdrawal of life support. (Dkt. No. 44-3, pp. 8–9; Dkt. No. 47-7, pp. 2–3).

The Final Autopsy Report declared the cause of death to be anoxic brain injury due to acute epiglottitis. (Dkt. No. 49-12, p. 1). The Report notes in the External Examination section that Decedent had a "vertical 2.5 cm sutured incision on midline trachea, consistent with prior tracheostomy." (*Id.*, p. 3). In the Larynx and Trachea section, it was noted that Decedent had "a vertical incision on the anterior aspect of the trachea, measuring 2.0 cm in length, with abundant hemorrhage into the surrounding soft tissue . . . ." (*Id.*, pp. 3–4).

### C. Conflicting Expert Opinions

The parties have submitted the following opinions from medical experts who disagree as to whether Caffrey and Dr. Sturm departed from any standard of care in treating Decedent, and whether any such deviation caused her death.

### 1) Plaintiff's Expert

David Bachman, M.D., is a Board Certified Emergency Medicine Physician. (Dkt. No. 49-14, ¶ 1). Dr. Bachman states in his affidavit that Dr. Sturm and Caffrey failed to comply with the standard of care throughout their treatment of Decedent. (*Id.*, ¶ 7). First, Dr. Bachman faults Caffrey for waiting approximately an hour to call her supervising physician, Dr. Sturm, despite recognizing Decedent's "acute, critical and life-threatening condition." (*Id.*, ¶ 11). Second, Dr. Bachman faults Caffrey for "failing to arrange for a helicopter transfer and the assistance of a critical care trained flight crew upon formulating the diagnosis of acute epiglottitis or at a minimum, an ambulance transfer." (*Id.*, ¶ 23). Third, Dr. Bachman opines that Caffrey and Dr. Sturm violated the standard of care "through the decision to perform a rapid sequence intubation prior to and as opposed to a needle or surgical cricothyrotomy." (*Id.*, ¶ 16). Dr. Bachman further faults them for "administering sedative and paralytic agents to a patient who had been maintaining her own airway but for whom it could be predicted that the airway edema associated with her progressive epiglott[it]is, would make endotracheal intubation extremely difficult." (*Id.*, ¶ 25). Fourth, Dr. Bachman states that they erred by not using a bougie during the intubation. (*Id.*, ¶¶ 14, 19). Fifth, Dr. Bachman states that Caffrey and Dr. Sturm "fail[ed] to follow proper technique" in performing the cricothyrotomy. (*Id.*, ¶ 28). Specifically, Dr. Bachman opines that they failed to make the required horizontal incision and used too small a tube for the procedure. (*Id.*, ¶¶ 14, 28).

In addition, Dr. Bachman opines that all of these deviations from the standard of care caused or contributed to the death of Mrs. Breitenbach; he states that "there were a multitude of proximate causes which all individually and collectively caused her condition and had each of these elements of care and treatment not occurred, it is my opinion with a reasonable degree of

certainty that she would not have suffered and ultimately died." (*Id.*, ¶ 20). Finally, Dr. Bachman asserts that the "general delay in care and treatment" also "actively contributed to the decedent's ultimate demise." (*Id.*, ¶ 21).

### 2) Defendants' Experts

#### a. Daniel K. Pauzé, M.D.

Daniel K. Pauzé, M.D., is also a Board Certified Emergency Medicine Physician. (Dkt. No. 46-3, ¶ 1). First, Dr. Pauzé states that it was reasonable for Caffrey to decide to call for an ambulance upon learning that the helicopter would not arrive for fifty-five minutes. (*Id.*, ¶ 6). Further, Dr. Pauzé states that "I do not feel that waiting longer for the helicopter crew would have been reasonable in this situation, when it is unclear what type of training and experience will arrive in the setting of a significantly ill patient that would best be served by transport to a tertiary care facility as quickly as possible." (*Id.*, ¶ 7).

Second, Dr. Pauzé states that the procedures followed by Caffrey and Dr. Sturm in establishing an airway were appropriate. (*Id.*, ¶ 8). Dr. Pauzé opines that Caffrey and Dr. Sturm were in a "forced to act" situation with respect to securing Decedent's airway, given the unavailability of an anesthesiologist or ENT specialist and the need for an airway before Decedent could be transported. (*Id.*, ¶ 9). Dr. Pauzé states that in establishing the airway, Caffrey and Dr. Sturm reasonably followed the recommended course of action, starting with awake intubation, then RSI, and then cricothyrotomy. (*Id.*, ¶ 11). Dr. Pauzé notes that a cricothyrotomy is a "rare procedure that most providers rarely if ever perform in their career," which "can be made even more difficult due to a patient's distorted anatomy." (*Id.*, ¶ 12). Further, Dr. Pauzé opines that "it is unlikely that the outcome would have been substantially different if the providers had proceeded directly to a cricothyrotomy and had not attempted a

rapid sequence intubation first." (*Id.*). In sum, Dr. Pauzé opines that, given "the significant challenge at hand," both Caffrey and Dr. Sturm acted in a reasonable manner. (*Id.*, ¶ 13).

### b. Alan C. Heffner, M.D.

Alan C. Heffner, M.D., is a Board Certified Emergency Medicine and Critical Care Physician. (Dkt. No. 44-11, ¶ 1). In his affirmation, Dr. Heffner also opines that Caffrey and Dr. Sturm did not deviate from the standard of care or cause injury to Decedent. (*Id.*, ¶ 7). First, Dr. Heffner opines that "the decision to use land transport (ambulance) met the standard of ca[r]e as the ambulance was readily available and a helicopter could not even be at Moses-Ludington for at least 55 minutes." (*Id.*, ¶ 26). Dr. Heffner further opines that Caffrey was prudent to delay Decedent's transfer because of the "signs of critical airway compromise and impending airway obstruction." (*Id.*, ¶ 29). Second, Dr. Heffner agrees that Caffrey and Dr. Sturm were in a "forced to act" situation and that the procedures they used were appropriate. (*Id.*, ¶¶ 30–31). Specifically, Dr. Heffner states that "it was reasonable medical judgment for the team to attempt RSI in this case context and prior to cricothyrotomy." (*Id.*, ¶ 33). Dr. Heffner opines that the use of a bougie was not the standard of care in 2014, and even if it was, there is no indication that it would have led to a different outcome. (*Id.*, ¶¶ 37–38). As to the cricothyrotomy, Dr. Heffner finds no fault with the incision and states that "[t]he difficulty that the defendants encountered in placing the tracheal tube following tracheal incision is also well recognized and does not represent a deviation from the standard of care." (*Id.*, ¶ 39). In sum, Dr. Heffner opines that Caffrey and Dr. Sturm "fully met, adhered with and exceeded the standard of care and did not cause any injury or damage to" Decedent. (*Id.*, ¶ 40).

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing . . . a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.

2003).  Still, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*,

804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d

Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves

create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593

F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)

(alterations in original) (internal quotation marks and citations omitted)).

## V.    DISCUSSION

In general, Defendants argue that they are entitled to summary judgment on Plaintiff's

medical malpractice claim on the basis that the evidence shows that the treatment provided to

Decedent complied with the relevant standards of care and did not cause Decedent's death.

(Dkt. No. 44-14; Dkt. No. 46-1).  Defendants also seek to preclude Plaintiff's medical expert,

Dr. Bachman, from submitting evidence in opposition.  (Dkt. No. 44-14; Dkt. No. 51-1).

Specifically, Defendants argue that Dr. Bachman is not qualified to give an expert opinion, that

his opinions are speculative in nature, and that they exceed the scope of his expert report.  (*Id.*).

Plaintiff has not responded to this argument.  Since Plaintiff's medical malpractice claim hinges

largely on Dr. Bachman's opinions, the Court will address them first.

### A.  Dr. Bachman's Opinions

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a

"gatekeeping" obligation with respect to expert testimony, both at trial and on summary

judgment: the trial judge must ensure "that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "Generally speaking, expert qualifications are liberally construed."  *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004) (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985); *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000)).

"Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community."  *Restivo v. Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (internal quotation marks and citations omitted).  The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[ ] upon the particular circumstances of the particular case at issue."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).  When applying the gatekeeping obligation to non-scientific testimony, a district court may choose to utilize some or all of the above *Daubert* factors, or it may look to other indicia of reliability.  *Id.*

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Natl. R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* In other words, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

First, Defendants argue that Dr. Bachman is not qualified as an expert in this case given that "he has never treated adult epiglottitis, has not treated a child with epiglottitis in almost thirty years and has never performed a cricothyrotomy." (Dkt. No. 44-14, pp. 13–14). However, Dr. Bachman is a licensed physician, Board Certified in Emergency Medicine, with many years of experience in adult emergency medicine and airway management. (Dkt. No. 49-14, ¶¶ 1–2; *see generally* Dkt. No. 49-15). Defendants' arguments as to Dr. Bachman's qualifications do not support precluding his opinions entirely, but rather go to the weight a factfinder might give them. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility."); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("Thus, a witness' lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony.").

Second, Defendants argue that Dr. Bachman relies on baseless speculation for his opinion that Caffrey should have called for helicopter transport with "a flight crew with advanced airway skills," instead of waiting for an ambulance. (Dkt. No. 44-14, pp. 14–15). At his deposition, Dr. Bachman testified that a helicopter would have been faster and provided "additional resources," offering Decedent a better chance for survival. (Dkt. No. 44-8, p. 62). However, Dr. Bachman admitted that he did not know which transport service would have provided the helicopter. (*Id.*, pp. 38–40). Further, Dr. Bachman testified that he did not know the medical qualifications of anyone that would have been on the helicopter or what equipment they would have had. (*Id.*, pp. 40–41). Indeed, Dr. Bachman assumed that Fletcher Allen could have sent its own helicopter, when in fact MLED had to rely on Essex County for air transport. (Dkt. No. 44-6, p. 30; Dkt. No. 44-8, pp. 38–39). In sum, Dr. Bachman's opinion as to the potential benefit of helicopter transfer rests on unfounded assumptions, and not sufficient facts or data. Accordingly, it is not reliable evidence for purposes of opposing Defendants' motions. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 418–19 (S.D.N.Y. 2013) (expert opinion excluded as unreliable where, *inter alia*, it was based on assumptions that "lack *any* basis in the record") (emphasis in original).

Third, Defendants protest Dr. Bachman's opinion that Caffrey "deviated from accepted standards of medical care in taking approximately an hour to confirm the diagnosis of epiglottitis instead of immediately transporting [Decedent] to another facility when she presented at the Emergency Room at approximately 7:45 [p.m.]" (Dkt. No. 51-1, p. 4 ). Defendants argue that Dr. Bachman never disclosed this theory of liability in his expert report or deposition, and therefore, he cannot raise it now to help Plaintiff evade summary judgment. (*Id.*, pp. 5–6). However, in the expert report, Dr. Bachman criticized "the means and timing of

transfer to tertiary care," and he faulted Caffrey for "not immediately requesting the assistance of her supervising physician." (Dkt. No. 49-17, pp. 5, 7). In his deposition, Dr. Bachman testified that his biggest concern overall included "the timing of decision-making" and "the timing of transporting." (Dkt. No. 44-8, p. 30). Therefore, Defendants had sufficient notice of this theory of liability.

## B. Plaintiff's Medical Malpractice Claim

Under New York law, the "essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." *DiMitri v. Monsouri*, 302 A.D.2d 420, 421, 754 N.Y.S.2d 674, 675 (2d Dep't 2003). In moving for summary judgment, the defendants must make a prima facie showing that they "did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries." *Ducasse v. N.Y. City Health & Hosps. Corp.*, 148 A.D.3d 434, 435, 49 N.Y.S.3d 109, 111 (1st Dep't 2017) (citation omitted). In order to rebut this showing and survive summary judgment, a plaintiff "must submit evidentiary facts or materials," typically through expert testimony, and "demonstrate the existence of a triable issue of fact." *Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324, 501 N.E.2d 572, 574, 508 N.Y.S.2d 923, 925 (1986); *see also Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987). The plaintiff's expert testimony need only rebut the prima facie showing made by the defendants. *See Stukas v. Streiter*, 83 A.D.3d 18, 30, 918 N.Y.S.2d 176, 186 (2d Dep't 2011). In general, "[s]ummary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury." *DiGeronimo v. Fuchs*, 101 A.D.3d 933, 936, 957 N.Y.S.2d 167, 171 (2d Dep't 2012) (internal citations omitted).

18

Plaintiff's medical malpractice claim can be broadly divided into four theories of liability based on various alleged deviations from the standard of care: 1) delay in the initial response to Decedent's diagnosis; 2) failure to transfer Decedent via helicopter; 3) improper efforts to intubate Decedent; and 4) improper efforts to perform the surgical cricothyrotomy. (*See* Dkt. No. 18; Dkt. No. 49-17).  Thus, in moving for summary judgment, Defendants must make a prima facie showing that Caffrey and Dr. Sturm did not depart from the standard of care in these areas, or that any deviation did not cause the claimed injury.

### 1)  Delay in Initial Response

Plaintiff's first theory suggests that, upon diagnosing Decedent with epiglottitis, Caffrey should have immediately called Dr. Sturm and an ambulance for transfer to Fletcher Allen. However, Defendants have made a prima facie showing that Caffrey did not depart from the standard of care.

Defendants have pointed to evidence that shows that Caffrey waited to call Dr. Sturm until she did testing to confirm the diagnosis and commenced treatment.  (Dkt. No. 44-2, p. 12; Dkt. No. 44-6, p. 30).  Caffrey also testified that during this time she contacted Dr. Hubbell, the ENT specialist, to arrange for transfer.  (Dkt. No. 44-6, p. 30).  Dr. Hubbell recommended immediate transfer and agreed with the medications Caffrey had ordered.  (*Id.*, p. 32).  Caffrey testified that Decedent's condition deteriorated while awaiting transfer, and at that point, Caffrey called Dr. Sturm.  (*Id.*, pp. 32, 43–44).

In rebuttal, Dr. Bachman opines that Caffrey deviated from the standard of care by delaying almost an hour to engage her supervising physician for help "in the management of a patient with an impending airway obstruction."  (Dkt. No. 49-14, ¶¶ 11, 21–22).  But this opinion is predicated on the idea that Caffrey diagnosed Decedent with epiglottitis at 7:45 p.m.

upon her return to MLED. In fact, the record shows that, at the time, Caffrey was "concerned about the possibility of epiglottitis," and she ordered a "stat" soft tissue neck X-ray at 7:57 p.m. (Dkt. No. 44-2, pp. 12, 36, 44). At 8:12 p.m., the X-ray results came back, only then confirming the diagnosis. (*Id.*, p. 40). Caffrey then consulted with Dr. Hubbell and arranged Decedent's transfer. (Dkt. No. 44-6, pp. 28–30). During this time, Decedent was still breathing on her own, and it was only later, when she started to deteriorate, that Caffrey called Dr. Sturm. (Dkt. No. 44-2, pp. 12–13; Dkt. No. 44-6, p. 32). Therefore, Plaintiff has failed to raise an issue of fact that Caffrey deviated from the standard of care by not immediately calling Dr. Sturm.

Defendants have also pointed to evidence showing that Caffrey could not have immediately called an ambulance. Defendants established that Caffrey needed to first confirm the diagnosis, start treating Decedent, and arrange the transfer. From 7:41 p.m. until 7:57 p.m., Caffrey examined Decedent. (Dkt. No. 44-2, pp. 10, 44). From 7:57 p.m. until 8:12 p.m., Decedent underwent tests and an X-ray to confirm the diagnosis. (*Id.*, pp. 12, 34–36, 40, 44). Then Caffrey started Decedent on medication, up until 8:20 p.m. (Dkt. No. 44-2, pp. 32–33; Dkt. No. 44-6, p. 29). At that time, Caffrey called Dr. Hubbell, who agreed to accept Decedent at Fletcher Allen. (Dkt. No. 44-2, p. 12; Dkt. No. 44-6, p. 30). Caffrey then called an ambulance. (Dkt. No. 44-6, pp. 30–31).

In rebuttal, Dr. Bachman asserts that Caffrey deviated from the standard of care by not calling immediately for an ambulance. (Dkt. No. 49-14, ¶ 11). Dr. Bachman suggests that Caffrey knew immediately upon seeing Decedent that she was suffering from acute epiglottitis. (*Id.*). He contends that had the ambulance been called at this time, Decedent would have arrived at Fletcher Allen before she deteriorated and intubation attempts began. (*Id.*).

However, the record shows that Caffrey did not know at the outset that Decedent had acute epiglottitis, as discussed above. (*See* Dkt. No. 44-2, pp. 12, 40; Dkt. No. 44-6, p. 30). Moreover, before calling an ambulance, Caffrey had to first arrange with a physician to accept the patient. (Dkt. No. 44-2, p. 12; Dkt. No. 44-6, p. 30; Dkt. No. 46-5, p. 4). As soon as Caffrey confirmed the diagnosis, she started treating Decedent and called Dr. Hubbell for the transfer. (Dkt. No. 44-2, p. 12; Dkt. No. 44-8, pp. 28–29). Once Dr. Hubbell agreed to accept Decedent, Caffrey called an ambulance "so that they would be on their way to get her moving." (Dkt. No. 44-6, pp. 30–31; Dkt. No. 47-5, p. 3). Accordingly, Plaintiff has failed to raise an issue of fact that Caffrey deviated from the standard of care by not calling immediately for an ambulance.

### 2) Transfer Via Helicopter

Plaintiff's second theory suggests that Caffrey should have arranged for a helicopter to transport Decedent instead of waiting for an ambulance. First, the record indicates that a helicopter would not have arrived at MLED for at least fifty-five minutes, whereas the ambulance came in ten minutes, with another fifty-five to take Decedent to Fletcher Allen. (Dkt. No. 44-6, p. 30; Dkt. No. 47-5, pp. 3–5). Moreover, even if a helicopter had arrived fifty-five minutes after the confirmed diagnosis, air transport would not have been an option because Decedent had already begun to deteriorate and did not have a stable airway. (Dkt. No. 44-2, pp. 12–13; Dkt. No. 44-6, p. 32). Caffrey and Dr. Sturm testified that transporting Decedent without a stable airway would have been dangerous, a view shared by Defendants' experts. (Dkt. No. 44-5, p. 46; Dkt. No. 44-6, pp. 40, 43–44; Dkt. No. 44-11, ¶¶ 26, 29; Dkt. No. 46-3, ¶ 7). Thus, Defendants have made a prima facie showing that the decision to forgo helicopter transfer did not depart from the standard of care or cause injury.

In rebuttal, Dr. Bachman opines that Caffrey failed "to arrange for a helicopter transfer and the assistance of a critical care trained flight crew upon formulating the diagnosis of acute epiglottitis." (Dkt. No. 49-14, ¶ 23).  As discussed above, Dr. Bachman's opinion in this area is not reliable.  Accordingly, Plaintiff has failed to raise an issue of fact that Caffrey deviated from the standard of care or caused Decedent's death by not requesting a helicopter transfer.

### 3)  Intubation Efforts

Plaintiff's third theory suggests that Caffrey and Dr. Sturm erred in their intubation efforts, in that: 1) they performed the RSI before the cricothyrotomy; and 2) they failed to use a bougie during intubation.

### a.  Methodology

Defendants' experts opine that the plan utilized by Caffrey and Dr. Sturm in this case— first attempting an awake intubation, then performing RSI while preparing for a cricothyrotomy, and only resorting to a cricothyrotomy after the RSI failed—is the standard procedure for establishing an airway in an adult epiglottitis patient.  (Dkt. No. 44-11, ¶¶ 30–31, 33; Dkt. No. 46-3, ¶ 8).  This procedure is also supported by the medical literature.  (*See* Dkt. No. 49-19).  Dr. Hubbell also agreed with the plan.  (Dkt. No. 44-2, p. 13; Dkt. No. 47-6, p. 4).  Furthermore, Dr. Pauzé opined that the "inherent difficulties" in establishing an airway in a patient with epiglottitis and distorted anatomy make it unlikely that the outcome would have changed had they attempted cricothyrotomy first.  (Dkt. No. 46-3, ¶ 12).  Thus, Defendants have made a prima facie showing that the decision to start with the RSI did not depart from the standard of care or cause injury.

In rebuttal, Dr. Bachman opines that Defendants violated the standard of care "through the decision to perform a rapid sequence intubation prior to and as opposed to a needle or

22

surgical cricothyrotomy."  (Dkt. No. 49-14, ¶ 16).  However, Dr. Bachman admitted at his deposition that most adult epiglottitis patients can be managed using RSI, and that Caffrey and Dr. Sturm had more experience with RSI than with cricothyrotomy.  (Dkt. No. 44-8, pp. 49–53).  Ultimately, Caffrey and Dr. Sturm faced a choice between two proven treatment options, both high risk but typically effective, and they had to make a judgment call.  There is no dispute that they followed the recommended procedure.  (*See* Dkt. No. 49-19) (recommending one attempt at endotracheal intubation using video laryngoscope then RSI while second physician prepares for needle and/or surgical cricothyrotomy).  And there is no dispute that they chose the option with which they had more experience.

Accordingly, Plaintiff has failed to raise an issue of fact that Caffrey and Dr. Sturm departed from the standard of care by performing the RSI before the cricothyrotomy.  *See Dumas v. Adirondack Med. Ctr.*, 89 A.D.3d 1184, 1186, 932 N.Y.S.2d 230, 232 (3d Dep't 2011) ("liability will not be imposed for an error in judgment if it is a judgment that a reasonably prudent doctor could have made under the circumstances," between "two or more medically acceptable courses of action") (internal quotation marks and citations omitted); *Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398, 767 N.E.2d 125, 128, 740 N.Y.S.2d 668, 671 (2002) ("Not every instance of failed treatment or diagnosis may be attributed to a doctor's failure to exercise due care.") (internal citation omitted).

### b.  Failure To Use Bougie

Defendants' expert Dr. Heffner asserts that, during intubation, a bougie was not required by the standard of care in 2014.  (Dkt. No. 44-11, ¶ 37).  Moreover, Defendants argue that a bougie would not necessarily have helped Decedent, noting that upon arrival at Fletcher Allen, an ENT resident was unable intubate her using a bougie.  (Dkt. No. 44-3, p. 12; Dkt. No. 44-11,

¶ 38).  Defendants have thus made a prima facie showing that the failure to use a bougie did not depart from the standard of care or cause injury.

In rebuttal, Dr. Bachman states that the use of a bougie to help facilitate intubation was within the standard of care in 2014.  (Dkt. No. 49-14, ¶ 25).  Dr. Bachman cites an article which states that a bougie "is an effective and inexpensive adjunct to difficult airway management that is easy to use."  (*Id.*).[14]  The article recommends that a bougie "be readily available in every emergency department."  (*Id.*).  The article includes citations to medical literature predating 2014 that also encourages the use of a bougie.  (*Id.*).  Dr. Bachman testified that a bougie is "recognized as kind of a lifeline many times for a difficult airway," and that it assisted passage of a breathing tube.  (Dkt. No. 44-8, pp. 56–57).

As to causation, Dr. Bachman testified that he thought it was possible that using a bougie could have led to a better outcome.  (*Id.*, p. 65).  Defendants argue that this opinion is "entirely speculative," (Dkt. No. 44-14, p. 21), but "no expert could definitively conclude what *would have* happened under an alternative set of facts."  *Tarqui v. United States*, No. 14 Civ. 3523, 2017 WL 4326542, at *10, 2017 U.S. Dist. LEXIS 159619, at *30 (S.D.N.Y. Sept. 27, 2017).  "In this sense, all opinions with regard to proximate cause are speculative."  *Id.* (finding issues of material fact with respect to the proximate cause of Decedent's death).  Moreover, the record shows that an anesthesiologist at Fletcher Allen later successfully intubated Decedent using a bougie.  (Dkt. No. 44-3, p. 12).  Accordingly, given the conflicting expert evidence, there is an issue of fact as to whether Caffrey and Dr. Sturm departed from the standard of care by not using a bougie, and whether that deviation caused Decedent's death.

---

[14] *See* UptoDate, *Endotracheal tube introducers (gum elastic bougie) for emergency intubation*, https://www.uptodate.com/contents/endotracheal-tube-introducers-gum-elastic-bougie-for-emergency intubation?search=endotracheal%20tube%20introducers%20gum&source=search_result&selectedTitle=1 ~149&usage_type=default&display_rank=1 (last visited August 28, 2018).

### 4) Surgical Cricothyrotomy

Plaintiff's fourth theory suggests that Caffrey and Dr. Sturm erred in performing the surgical cricothyrotomy, in that: 1) they made the wrong type of incision; and 2) they used the wrong size of tube.

### a. Type of Incision

There is no dispute that a surgical cricothyrotomy calls for a vertical incision in the throat and a horizontal incision through the underlying cartilage for placement of the tube. (Dkt. No. 44-5, p. 78; Dkt. No. 49-14, ¶ 28). Caffrey testified that she believed that she made a vertical incision through Decedent's skin, and then a horizontal incision through the cartilage. (Dkt. No. 44-6, p. 67). Defendants have thus made a prima facie showing that they did not depart from the standard of care.

In rebuttal, Dr. Bachman points out that the Final Autopsy Report references only a vertical incision. (Dkt. No. 49-14, ¶ 28). According to Dr. Bachman, the horizontal incision in the cricothyroid membrane "is the critical and essential step in the procedure." (*Id.*). The Final Autopsy Report states that Decedent had a "vertical 2.5 cm sutured incision on midline trachea." (Dkt. No. 49-12, p. 3). It also notes that Decedent had "a vertical incision on the anterior aspect of the trachea, measuring 2.0 cm in length, with abundant hemorrhage into the surrounding soft tissue." (*Id.*, pp. 3–4). There is no mention of a horizontal incision. Dr. Heffner also states that "[t]here is no indication in the autopsy report as to whether the vertical trachea defect stems from the first incision, the second incision, or a consequence of tracheal manipulation during or after the procedure." (Dkt. No. 44-11, ¶ 39). Dr. Sturm testified that she "wasn't watching exactly as [Caffrey] cut." (Dkt. No. 44-5, p. 78). In addition, Caffrey testified that a 5.0 millimeter tube was too big for the incision she made. (Dkt. No. 44-6, p. 71).

Based on this evidence, it is unclear if Caffrey made a proper horizontal incision that would have allowed ready passage of a tube and oxygenation of Decedent. There is no dispute that Decedent's oxygen levels dropped during the procedure, that she went into cardiac arrest, and that Caffrey was unable to pass a standard 5.0 millimeter tube. (Dkt. No. 44-2, pp. 14–15; Dkt. No. 44-5, p. 84; Dkt. No. 44-6, pp. 71–75; Dkt. No. 47-6, p. 6). Viewing the evidence in the light most favorable to Plaintiff, there is an issue of fact as to whether Caffrey and Dr. Sturm departed from the standard of care, and whether that deviation caused Decedent's death.

### b. Size Of Tube

Finally, Plaintiff suggests that the 3.5 millimeter tube used by Defendants was too small to properly oxygenate Decedent. Defendants have made a prima facie showing that using this tube did not depart from the standard of care or cause injury. Caffrey and Dr. Sturm testified that the 3.5 millimeter tube was only used after Caffrey failed to place the 5.0 millimeter tube. (Dkt. No. 44-5, p. 84; Dkt. No. 44-6, p. 71). In addition, the ambulance records show that Decedent remained appropriately oxygenated after the tube was placed and throughout her trip to Fletcher Allen. (Dkt. No. 44-5, p. 88; Dkt. No. 47-5, p. 3).

In rebuttal, Dr. Bachman opines that a 3.5 millimeter tube is more commonly used for children versus the standard 5.0 millimeter tube for adults. (Dkt. No. 44-8, p. 77; Dkt. No. 49-14, ¶¶ 14, 20). Dr. Bachman affirmed that the smaller tube "did not allow effective ventilation as evidenced by the arterial blood gas results" at Fletcher Allen. (Dkt. No. 49-17, p. 6). However, even if the smaller tube departed from the standard of care, Dr. Bachman testified that he thought "the die was already cast due to her prolonged arrest in the emergency department." (Dkt. No. 44-8, p. 78). The record shows that Decedent went into cardiac arrest for approximately ten minutes during the surgical cricothyrotomy—before the 3.5 millimeter tube

was placed.  (Dkt. No. 44-2, pp. 14–15; Dkt. No. 44-5, pp. 91–92; Dkt. No. 44-6, pp. 71–72;

Dkt. No. 47-6, p. 6).  In other words, according to Dr. Bachman, Decedent had sustained the

ultimately mortal anoxic brain injury before the alleged departure from the standard of care.

Therefore, Plaintiff has failed to raise an issue of fact as to causation related to the size of the

tube used in the surgical cricothyrotomy.

### 5)  Summary

After careful review of the record, there is conflicting evidence as to whether Caffrey

and Dr. Sturm were required to use a bougie during intubation, whether they erred in the type of

incision used in the surgical cricothyrotomy, and whether any such departure from the standard

of care caused Mrs. Breitenbach's death.  These issues of fact must be resolved at trial.  *See

Hodosh v. Block Drug Co., Inc.*, 786 F.2d 1136, 1143 (Fed. Cir. 1986); *Penrose v. United

States*, No. 13 Civ. 1060, 2016 WL 796062, at *5–6, 2016 U.S. Dist. LEXIS 22285, at *15–18

(N.D.N.Y. Feb. 24, 2016) (finding that conflicting expert testimony creates questions of fact

"best left to the fact finder"); *Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 412 (N.D.N.Y.

2012) (noting that "conflicting expert testimony . . . creates questions of fact and credibility

determinations to be answered by the jury"); *Speller ex rel. Miller v. Sears, Roebuck and Co.*,

100 N.Y.2d 38, 44, 790 N.E.2d 252, 256, 760 N.Y.S.2d 79, 83 (2003) ("Where causation is

disputed, summary judgment is not appropriate unless only one conclusion may be drawn from

the established facts") (internal quotation and citation omitted); *Deutsch v. Chaglassian*, 71

A.D.3d 718, 719, 896 N.Y.S.2d 431, 432 (2d Dep't 2010) (summary judgment generally "not

appropriate in a medical malpractice action where the parties adduce conflicting medical expert

opinions. Such credibility issues can only be resolved by a jury.") (quoting *Feinberg v. Feit*, 23

A.D.3d 517, 519, 806 N.Y.S.2d 661, 662 (2d Dep't 2005)).

### C. Vicarious Liability Under the FTCA

As a further basis for summary judgment, the United States argues that it cannot be held liable for the actions of Caffrey because, unlike Dr. Sturm, she was not a federal employee covered by the FTCA. (Dkt. No. 46-1, pp. 10–11).

In general, the United States "is immune from suit save as it consents to be sued . . . ." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012). The FTCA waives sovereign immunity for claims of personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. In other words, the Government's vicarious liability under the FTCA turns on whether the alleged medical malpractice is attributable to a federal employee. *See Gibbons v. Fronton*, 533 F. Supp. 2d 449, 453 (S.D.N.Y. 2008). In determining the scope of liability, courts apply the law of the State where the acts in question occurred, subject to certain exceptions not applicable here. *Caban v. United States*, 728 F.2d 68, 73 (2d Cir. 1984).

New York law provides that "a physician supervising or employing a licensed physician assistant or registered specialist assistant shall remain medically responsible for the medical services performed by the licensed physician assistant or registered specialist assistant whom such physician supervises or employs." 10 NYCRR § 94.2(f). The term "medically responsible" has been construed "to include acts of negligence and medical malpractice allegedly committed by a physician's assistant supervised or employed by the physician." *Marchisotto v. Williams*, 11 Misc.3d 1089(A), at *5 (N.Y. Sup. Ct. 2006).

In this case, there is no dispute that Dr. Sturm is a federal employee within the meaning of the FTCA.  (Dkt. No. 11, ¶ 3).  Thus, the United States may be held liable for medical malpractice attributable to actions she took in the scope of her employment.  *Caban*, 728 F.2d at 73.  Dr. Sturm testified that when she and Caffrey treated Decedent, it was Dr. Sturm who ultimately "made the final decisions on what we would do and what course we would follow." (Dkt. No. 44-5, p. 19).  Therefore, at a minimum, the United States may have vicarious liability for the decision by Dr. Sturm to not use a bougie in intubating Decedent.

Moreover, under New York law, Dr. Sturm may be held liable for the actions taken by a physician's assistant—like Caffrey—under her supervision.  *See* 10 NYCRR § 94.2(f); *Marchisotto*, 11 Misc.3d 1089(A), at *5.  It logically follows that the United States steps into Dr. Sturm's shoes under the FTCA and may be held liable for alleged medical malpractice occurring under her supervision, such as Caffrey's incision for the surgical cricothyrotomy. Accordingly, the United States' argument against vicarious liability is without merit.

## VI.     CONCLUSION

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the Motion for Summary Judgment by Defendants Nancy A. Caffrey, R.P.A.-C, Inter-Lakes Health, Inc., and Moses-Ludington Hospital (Dkt. No. 44) is **GRANTED in part and DENIED in part, in accordance with this Decision**; and it is further

**ORDERED** that the United States' Motion for Summary Judgment (Dkt. No. 46) is **GRANTED in part and DENIED in part, in accordance with this Decision.**

**IT IS SO ORDERED.**

August 29, 2018
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge